Filed 11/15/24  In re K.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.G., a Person Coming Under the Juvenile Court Law. | |
| | D084248 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J520281) |
| Plaintiff and Respondent, | |
| v. | |
| A.G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Daniela A. Reali-Ferrari, Judge.  Affirmed in part, conditionally reversed in part and remanded with directions.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

A.G. (Mother) appeals a juvenile court order denying her petition under Welfare and Institutions Code[1] section 388 to change the order that terminated her reunification services as to K.G. (Child) and set the matter for hearing under section 366.26.

Mother additionally contends the San Diego County Health and Human Services Agency (Agency) did not comply with its inquiry duties under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and section 224.2.

We conclude the juvenile court did not abuse its discretion in denying Mother's section 388 petition. However, the Agency concedes it did not comply with its duty of ICWA inquiry and agrees a limited remand is appropriate for compliance with that duty. We accept the concession. Accordingly, we conditionally reverse the order terminating parental rights and remand for the limited purpose of requiring the Agency and juvenile court to comply with ICWA and section 224.2.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Initial Events and Agency Involvement*

Child suffered serious medical complications from the time of her birth in November 2019, including spina bifida that required surgery. She had specialist appointments with neurosurgery, cardiology, neurology, and urology. Under Mother's care, Child missed a neurology appointment and multiple neurosurgery appointments in December 2019 and January 2020.

On February 7, 2020, three-month-old Child was admitted to the hospital with hydrocephalus, or fluid in the brain causing an enlarged head, and a severe fungal skin infection on her neck. At the hospital, Mother appeared to experience a manic episode. After medical professionals

---

[1] Undesignated references are to the Welfare and Institutions Code.

2

explained leaving without treatment could result in brain damage or death, Mother attempted to remove Child's IV and repeatedly stated she wanted to take Child home. Mother also displayed slurred and disorganized speech, struggled to answer questions, roamed the hallways "asking people if the doctors are having sex with nurses, and if people eat babies," soiled herself, and appeared to hallucinate. Mother was unable to explain why she brought Child in, report when her infection began, or comprehend her medical needs. While Child was in the hospital, police arrested Mother on an outstanding warrant.

The maternal grandmother, with whom Mother resided, reported that Mother had been diagnosed with bipolar disorder and experienced recurring episodes every couple of months. Child's father (Father) was not involved in this incident.[2] Mother and Father also shared a one-year-old child who was not part of this incident and is not part of this case.

Medical staff believed Child had been neglected and, if returned to that environment, faced potential severe infection or death. Clinicians were concerned due to the prior missed appointments and because Child likely had the untreated fungal infection for at least one week. Thus, medical staff reported the case to the Agency.

Based on the missed appointments, signs of neglect, and Mother's behavior at the hospital, the Agency was concerned she would not be able to meet Child's needs due to untreated mental illness. Child was detained on February 10, 2020, while Mother was incarcerated.

On February 13, 2020, the Agency filed a Juvenile Dependency Petition under section 300, subdivision (b), alleging Mother's mental illness rendered

---

[2] Father had limited involvement with Child during the pendency of the case and is not part of this appeal.

3

her incapable of providing care to Child such that there was a substantial risk of serious harm or illness. The following day, the court held a detention hearing and found that the Agency had stated a prima facie case for initial removal and continued detention. The court further ordered reunification services and liberal supervised visitation.

B. *Subsequent Events and the Jurisdiction/Disposition Hearing*

On or around February 25, 2020, Child was placed in a licensed foster home with Cynthia and her partner Stephanie (Caregivers).

Shortly after the case began, Child underwent emergency surgery to have a shunt placed to drain the fluid in her head. In addition to hydrocephalus and spina bifida, Child was diagnosed with a heart murmur and clubbed feet. Following placement with Caregivers, Child had a developmental and behavioral screening that showed complex developmental, health, and behavioral concerns likely necessitating many future services.

In an initial interview with the Agency, Mother stated she did not believe she had neglected Child and felt that Child was detained because Mother was arrested. She felt it was "really stupid" that the Agency had concerns over her ability to care for Child due to mental health issues, and she reported that she had no recollection of her concerning behaviors at the hospital. Later, Mother denied any history of mental illness despite the maternal grandmother reporting the bipolar diagnosis and stated that the Agency became involved after her behavior at the hospital as a result of stress.

At a Child and Family Team meeting on March 6, 2020, Mother appeared to be experiencing another bipolar episode, displaying "slurred speech, tangential and disorganized thoughts, and quick transitions between highs and lows." Mother often interjected unrelated comments during the

4

conversation. She appeared confused, repeatedly asking if she was taking Child home today and once attempting to walk out of the room with Child. The maternal grandmother, also present at the meeting, stated that Mother suffered from mental health issues and agreed to take her to a hospital immediately after the meeting.

A few days after that meeting, Father reported to the Agency that mother threatened or attempted to jump off a bridge. The maternal grandmother then brought Mother to a psychiatric hospital.

By the end of April, Child was becoming more active, rolling and batting at toys. She was eating well, her head circumference had decreased, and her stitches and rashes were healing. In May, Child was engaged in occupational therapy and physical therapy and doing well in them.

During this period, Mother had some video visits with Child. At times, Mother showed signs of mental instability and became aggressive with Caregiver.

As a result of Mother's mental health issues and Child's complex needs, the Agency remained concerned Mother was unable to meet the needs of Child. Mother continued to struggle with attending all of Child's medical appointments. Among other requirements, the Agency's Case Plan included a psychological evaluation of Mother by a Treatment Evaluation Review Management (TERM) identified provider and individual therapy for her to assist her with handling her recurring mental health episodes. In May and June, however, Mother did not respond to the provider's repeated efforts to schedule a virtual mental health assessment. As of the Agency's June 2020 report, she did not disclose participation in any support services or progress on her case plan.

On July 6, 2020, the court held a contested jurisdiction and disposition hearing and made a true finding on the petition. The court concluded ICWA did not apply and ordered continued placement in the foster home and services and visitation for the parents.

C. *Six-month Review Period and Hearing*

Mother made some progress on her case plan during this period. In July 2020, Mother began parenting education sessions, which she completed in March 2021.

Additionally, Mother responded to the psychologist's repeated attempts to contact her and scheduled a virtual evaluation in September 2020. However, Mother was unable to complete the evaluation because she was distracted by her non-dependent child. After completing the evaluation in October, the psychologist concluded Mother meets the criteria of Bipolar I Disorder and Adjustment Disorder. The provider recommended therapy and medication services to assist with reunification. The evaluation report noted that Mother had limited insight into the existence of her mental health issues and how they impacted her. The psychologist included as treatment goals a medication referral, therapy, and education.

In March 2021, Mother began virtual visits with an Agency approved TERM therapist. The TERM therapist believed Mother was minimizing prior symptoms and declining to provide information. Indeed, Mother remained unsure why the Agency was involved. She believed she could meet Child's needs but seemed unsure of what treatment Child received.

Mother went for a medication evaluation; however, the clinic she attended does not prescribe medication unless there is an "active crisis," which Mother was not experiencing.

During this period, Mother was generally consistent with attending most weekly virtual visits with Child, though she missed some visits.

At the contested six-month review hearing on March 9, 2021, the court maintained existing placement, visitation, and reunification services. The court noted that Mother had made some progress on the case plan with minimal progress toward alleviating or mitigating the causes of removal and continued detention. The court continued to find ICWA notice was not required after a reasonable inquiry.

D. *Twelve-month Review Period and Hearing*

As of mid-2021, Child was comfortable and thriving in the home of Caregivers and her foster siblings. She had appointments with orthopedics, urology, neurology, neurosurgery, and the high-risk pediatric clinic every six months, which sometimes lasted hours. Caregivers reported that Mother did not attend these appointments. Child had physical and developmental delays but was progressing. Her physical conditions required diaper changes with ointment every 30 minutes; suppositories every morning and night to clear her bowels; and a weekly virtual physical therapy appointment and daily home program of three 25- to 30-minute sessions. She had casts on her legs to correct her clubbed feet.

Mother virtually visited with Child twice weekly at this time, often with Child's sister. These visits went well. However, it was often difficult for providers to reach Mother at other times.

The court held a 12-month review hearing on April 12, 2021. As at the prior hearing, the court: maintained existing placement, visitation, and reunification services; concluded that Mother had made minimal progress on the case plan; and concluded ICWA notice was not required after a proper inquiry.

7

E. *Eighteen-month Review Period and Hearing*

At the end of April 2021, the Agency's Protective Services Worker (PSW) provided Mother with resources regarding medication management and other psychoeducation. The Agency explained to Mother that, despite the prior evaluation, she still needed to address the issue of medication and offered to provide another referral. However, Mother believed she did not need medication, stating " 'I am not going to take medication just to take medication.' " Mother continued to assert the initial episode in the hospital was stress. She believed she did not need a further medication evaluation and thus failed to have one as recommended.

In mid-June 2021, the PSW had a conversation with Mother during which she was incoherent. Mother's speech was disorganized, and she stated she was depressed and stressed.

The following month, Mother sent Caregiver multiple confusing and inappropriate text messages before 6:00 a.m. stating, " 'I'm boss baby dude that's cool give her back to her husband' " and, " 'Go to hell Cynthia im getting my baby back u big o pedifile.' " Mother also posted strange and inappropriate messages on social media: " 'Angie Montes I do want my daddy and mommy together and u cannot slap my cookie I need to change my daughters Doogie,' " " 'I'm scratching wah,' " and " 'I think Cynthia's a Pedifile.' "

In July 2021, Mother ceased seeing her TERM therapist, instead purportedly participating in a faith-based group led by a friend. According to her friend, Mother attended the group " 'a couple of times.' "

Mother began in-person visitation with Child. Her visitation was inconsistent, failing to confirm, no showing, or cancelling visits, and she arrived late to other visits. At the visits, Mother understood Child's feeding

needs to a degree and changed her diaper. However, she struggled to recall and follow the instructions of doctors and service providers; for example, on one occasion, Mother failed to perform the occupational therapy exercises required prior to Child eating, resulting in her refusing to eat.

Mother attended only some of Child's feeding therapies, which were accessible remotely. Mother did not stay for the entirety of feeding therapy and physical therapy sessions. Consequently, Mother failed to learn about Child's new leg braces. Additionally, Mother did not attend July 2021 appointments regarding Child's legs and shunt.

The court held a contested 18-month reviewing hearing in November 2021.

The Agency recommended that the court terminate services to Mother and set a section 366.26 hearing. Despite Mother's participation in parenting classes and some therapy, the Agency did not see any improvement on Mother's ability to consistently attend medical and therapy appointments for Child, or arrive on time and remain the entire session when attending. Likewise, Mother was inconsistent with visitation and struggled to remember medical and therapeutic instructions. The Agency was also concerned about an inability to understand Child's diagnoses and needs. Mother often reported phone difficulties, leading to further concerns about her ability to care for a medically fragile child. The PSW noted Mother "often did not complete her thoughts," demonstrated "slow" speech and processing, and failed to understand concepts explained in a variety of ways.

Mother contended Child should be returned to Mother's care because: while she suffered postpartum depression at the onset of the case, she had since managed her mental health with no hospitalizations; she had taken good care of her older daughter; she participated in therapy for four months;

9

she attended some of Child's medical appointments; and her mother was available for transportation and support. At the time, Mother lived in Tijuana with her other daughter and planned to cross the border to San Diego for Child's medical appointments and emergencies.

The court terminated reunification services, finding there would be a substantial risk of detriment to Child's safety because: Child had complex medical needs, Mother failed to consistently attend medical and therapy appointments or have a full understanding of Child's needs, Mother failed to obtain a medication evaluation from a facility that provided medication without an active crisis, and Mother ceased attending therapy without understanding her treatment goals. The court ordered continued placement in Child's current resource home with supervised visitation for Mother and set a section 366.26 hearing.

F. *Post-service Termination Events*

1. *Child's Health and Development*

Child was active and happy; she was progressing well in occupational and physical therapy and becoming stronger and more verbal. Through early 2024, she continued to require numerous medical appointments with a variety of specialists, including spinal defects, orthopedics, neurosurgery, and urology; regular occupational, physical, and speech therapy; and attentive care, such as regular diaper changes and creams. She received services through the San Diego Regional Center and had an Individualized Education Plan (IEP).

2. *Mother's Activity*

In December 2021, Child had shunt surgery. Mother was invited to be present in person but did not attend. She had a virtual visit while Child was recovering in the hospital.

Between January and early March 2022, the Agency lost contact with Mother despite multiple attempts to contact her. Child had surgery to repair both Achilles tendons scheduled for March 2022. On March 9, 2022, Mother responded to the PSW's email, stating she agreed with the procedure and wanted to visit. However, Mother failed to respond to numerous attempts between March and July 2022 by the PSW to reach her. Thus, Mother had no visits with Child from January until August 2022. In August, Mother reported to the Agency that she did not have a phone and she had not been able to log in to her email account. At that time, Mother also informed the Agency that she had Blackfoot and Apache heritage. After one visit with Child on August 5, 2022, she did not see Child again until January 2023.

Although the parents held developmental and educational rights for Child, they had not been involved in Child's developmental services or meetings. In October 2022, the court granted Caregiver's request to co-hold authority over education and developmental services decisions for Child.

Mother began visits with Child again in January 2023. Although the visits were fairly consistent, Mother canceled some, including at the last minute, and failed to show at others, leaving Child waiting at the Agency for the visit.

In early 2024, Child had six medical appointments with specialists; Mother attended three.

3. *Section 366.26 Hearing Continuances and ICWA*

Prior to the contested hearing, the Agency requested multiple continuances to search for Father, to conduct a further ICWA inquiry due to Mother's reported Indian heritage, and to assess a relative for placement in Los Angeles. Father eventually had some inconsistent virtual visits in August 2022. The relatives failed to complete the resource parent screening.

11

The Agency began noticing the Blackfoot and Apache tribes and reported the need to follow up with maternal relative Bernard G., who was believed to be registered with a tribe. A maternal great aunt informed the Agency that she identifies with the Apache and Papaya Native tribes, and Bernard G. identifies as Muscogee (Creek) Nation. There is no evidence in the record that the Agency followed up with Bernard G.

On June 1, 2023, the Agency sent informal ICWA inquiries to the following tribes: Apache Tribe of Oklahoma; Blackfeet Tribe of the Blackfeet Indian Reservation of Montana; Fort Sill Apache Tribe of Oklahoma; Jicarilla Apache Nation (denied enrollment eligibility); Mescalero Apache Tribe; San Carlos Apache Tribe; The Muscogee (Creek) Nation (denied relationship to tribe); Tonto Apache Tribe of Arizona (denied enrollment eligibility); White Mountain Apache Tribe (denied enrollment eligibility); Yavapai-Apache Nation (denied enrollment eligibility). However, the Agency failed to provide the maternal grandmother's or great aunt's date of birth in the notices.

4. *Section 388 Motion and Hearing*

On December 13, 2023, Mother brought a section 388 motion, citing as changed circumstances Mother's stable mental health for the past two years, successful care of two other children, housing in San Diego near the maternal grandmother's, and consistent loving visitation. The court found prima facie evidence warranting an evidentiary hearing on the motion. The court held combined contested section 388 and section 366.26 hearings in April and May 2024.

By this time, Child had 11 confirmed medical diagnoses and required consistent care. Her brain shunt needed monitoring to ensure proper functioning; she could not walk due to her spinal conditions and used a wheelchair; her leg braces needed to be checked to ensure proper placement

12

and circulation; she had a specific diet to enable her to make bowel movements; she had to be changed regularly to avoid serious dermatitis and may eventually require a catheter to empty her bladder; and she had daily physical therapy exercises. The failure to perform these activities could have dire consequences for Child, such as kidney disease, brain damage, loss of a limb, or death. She was also diagnosed with intellectual disability, which included speech delays.

Caregivers' foster license is for placement of children with special healthcare needs, which required additional training. Their home meets American Disability Act requirements, with full access for Child's wheelchair. Caregiver Cynthia has Emergency Medical Technician and Licensed Vocational Nurse training and previously worked as an EMT. Caregivers had three other children with whom Child had developed close bonds, particularly the six-year-old boy. Caregiver and her partner were committed to adopting Child.

The maternal grandmother testified that, based on daily observation, Mother is a good, responsible parent who meets the needs of her other two children, a five-year-old daughter and ten-month-old son.[3] Notwithstanding the prior report that Mother had diagnosed bipolar disorder, the maternal grandmother testified that she had no concerns about Mother's mental health the previous several years and stated that Child was removed due to Mother's postpartum depression. The maternal grandmother had not attended any of Child's doctor's visits, did not know her diagnoses aside from spina bifida, and was not aware of the care she required at home due to her medical needs.

---

[3]     Mother gave birth to a third child in June 2023.

Mother testified that she had postpartum depression following Child's birth, but she had not been diagnosed by a doctor. Since the termination of services, Mother had moved to San Diego from Mexico, living in an upstairs, two-bedroom, low-income housing unit. She believed she could carry Child and her wheelchair upstairs, and she intended to move to a downstairs unit when possible. She also believed she did not have any mental health struggles and she had not had any anxiety or depression for two or three years. Mother testified that Father was mentally abusive, which contributed to her mental state after Child's birth; but her relationship with Father ended two and a half or three years previously. Additionally, Mother had no concerns about her ability to attend Child's frequent medical appointments, asserting her mother would drive her and Child to them. Mother admitted there was an almost one-year period in 2022 during which she did not see Child. Mother had not attended any of Child's Regional Center meetings or IEP meetings and did not know what services Child received at school. Also during her testimony, Mother denied making a social media post about Caregiver being a pedophile.

Based on this evidence, Mother first argued the changes in circumstances were: Mother had moved from Tijuana, Mexico to San Diego, giving her proximity to Child's health care team; Mother demonstrated the ability to provide care to her other two children; and the maternal grandmother also moved from Tijuana to San Diego and could provide reliable transportation, babysitting, and other support for Mother. Additionally, Mother's mental health stabilized, and she did not believe she required any mental health treatment. She believed she stabilized her mental health by not being in an unhealthy relationship and focusing on herself and her kids. And, since the year when she had only one visit, Mother

consistently visited Child once a week for the previous one and a half years. Second, Mother argued that it was in Child's best interest to be raised by her family of origin, with her full and half siblings, with the family culture, and to avoid the grief, loss, and identity struggle associated with adoption.

The Agency recommended the court deny the motion due to the complex medical and intellectual needs of Child. Mother did not attend all medical appointments, make additional effort to learn Child's medical needs, or follow all medical advice given. Between February and April 2024, for example, Mother visited Child four times and cancelled three scheduled visits. During these visits, Mother played with and fed Child; however, Mother brought processed, preservative filled foods despite the doctor's instructions otherwise. Her visitation was inconsistent at times, and she did not progress to unsupervised visitation at any time. Mother did not attend any developmental screenings, assessments, or plan meetings, leaving her "unaware of [Child]'s developmental needs and/or how to meet them." Mother had been difficult to reach throughout the case, which could pose a problem for Child's medical care team. The Agency further argued Mother did not present any evidence to support her mental stability. The best interest of Child would be to remain in her home of over four years, from the time she was three months old, where she had all needs met and was thriving, despite her various challenges. The Agency noted Mother only made general statements about biological relationships, without any argument specific to Mother and Child's relationship.

Child's counsel agreed with the Agency and requested the court deny the section 388 petition. Counsel agreed that Mother failed to present evidence to support her claim of mental stability and noted that Mother recently missed eight weekly visits in a six-and-a-half-month period, in

15

addition to three out of seven medical appointments. Counsel argued Mother lacked sufficient knowledge to care for Child's needs, such as changing her leg braces, and the consequences could be grave.

On April 30, 2024, the court denied Mother's section 388 petition, concluding: (1) Mother's testimony that she stayed away from unhealthy relationships and focused on her family was insufficient evidence to demonstrate that she resolved the issues resulting in the detention; and (2) the best interest of Child was to remain with Caregivers, with whom she had lived for over four years since she was three months old, who met all of her complex medical and developmental needs, and with whom she was thriving despite her challenges. Although Mother expressed a desire to care for Child, Mother failed to demonstrate she would be able to meet Child's complex needs; for example, she had attended four of the seven most recent medical appointments and was not familiar with Child's educational and developmental needs. She was not seeing a therapist, a psychiatrist, or taking any medication.

The court made its section 366.26 ruling on May 28, 2024.[4] Following the recommendation of the Agency and Child's counsel, the court found Child specifically adoptable and adoption in her best interest. The court concluded the parent-child benefit exception did not apply because: Mother did not consistently visit Child throughout the case, noting in particular the long period in 2022 with no visitation; and Mother's relationship with Child was not strong enough to outweigh the benefit of the permanent adoptive home, particularly in light of her complex needs. Thus, the court terminated

---

[4] Mother has not challenged the court's section 366.26 ruling as part of this appeal.

16

parental rights and ordered the permanent plan of adoption. The court also found ICWA inapplicable to the proceeding.

DISCUSSION

Mother contends: (1) the juvenile court abused its discretion in denying her section 388 petition, and (2) the Agency failed to fulfill its duties of inquiry under ICWA. We conclude the court did not abuse its discretion when it denied the section 388 petition, but a conditional remand is necessary in light of the Agency's concession on ICWA.

A. *Section 388 Petition*

Under California's dependency scheme, the parent receives a reasonable amount of time to reunify with the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Once the court determines reunification efforts were unsuccessful and issues an order terminating reunification services, "the child's interest in permanency and stability takes priority" (*ibid.*) over "the parents' interest in the care, custody and companionship of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) However, section 388, subdivision (a)(1), provides the parent the right to petition the court to change, modify, or set aside its order terminating reunification services based on changed circumstances or new evidence. (*Marilyn H.*, at p. 309.)

Under section 388, the petitioning parent bears the burden of showing by a preponderance of the evidence that: (1) there has been a change of circumstance or new evidence since the challenged court ruling, such that (2) the proposed modification is in the child's best interests. (*Stephanie M., supra*, 7 Cal.4th at p. 317; see § 388, subds. (a)(1) & (d).) We review the juvenile court's ruling for abuse of discretion. (*Stephanie M.*, at p. 318.)

"A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently

17

absurd determination.' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641.) Rather, " '[t]he reviewing court should interfere only " 'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' [Citations.]" [Citation.]' " (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 863.)

1. *Change in Circumstances*

For the first prong, the parent must "establish[ ] a substantial change of circumstances . . . by showing that, during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*In re J.M.* (2020) 50 Cal.App.5th 833, 846.) Mother contends her circumstances changed since the 18-month review hearing because: there was no evidence she had mental health issues during that time, supported by her safely caring for her two other non-dependent children; Mother obtained housing in San Diego, moving from Tijuana, and had the support of the maternal grandmother; she consistently visited Child and attended her medical appointments; she was no longer in a relationship with Father; and she demonstrated knowledge of Child's medical issues at the contested hearing. We conclude the court did not abuse its discretion by determining no change in circumstances or new evidence existed to support a modification of order terminating reunification services.

There is no evidence that any of the circumstances cited by the court in terminating reunification services had changed at the time of the section 388 hearing. Child continued to have complex medical needs, Mother continued

18

to inconsistently attend medical and therapy appointments and apply medical advice, and Mother failed to pursue further mental health treatment.

Throughout this case, the Agency's main concern was that Mother, with her mental instability, could not safely care for Child, with her complex medical issues. Mother failed to present evidence to carry her burden to establish that she had taken steps to resolve her mental health issues such that she could safely care for Child. Her claim that "[n]o evidence showed she had any mental health issues" during the relevant time does not suffice. There is no evidence that, since the court's order terminating reunification services, Mother obtained a follow-up medication evaluation as recommended by the Agency. Mother's few months of TERM therapy occurred prior to the termination of reunification services and was not a change of circumstance or new evidence; there is no evidence she has resumed therapy or had taken any further steps to address her mental health.

Mother's care for her other children without court intervention does not support the argument that there was a change in circumstance or new evidence relating to Mother's mental health; Mother argued at the 18-month review hearing that Child should be returned to her custody because she had taken good care of her other daughter. Moreover, Mother's care for a non-medically complex child does not establish her ability to care for a medically complex child.

Nor did the court abuse its discretion by determining that Mother had not shown that she resolved concerns over her ability to meet Child's complex needs. In late 2021 and early 2022, following the termination of reunification services, Child had two surgeries. Mother was not present for these surgeries and had one virtual visit with Child. Shortly thereafter, the Agency lost contact with Mother for months at a time, and Mother had one visit with

19

Child during an approximately one-year period. Even when she resurfaced in January 2023, Mother continued to miss Child's medical appointments and remained uninvolved in Child's educational and developmental meetings. Although she demonstrated some knowledge of Child's medical issues at the section 388 hearing, she did not always consistently demonstrate an understanding of Child's needs or properly apply medical advice.

While Mother's relocation to San Diego was a change in circumstance, it did not resolve the issues leading to dependency and thus was not a significant change that justified setting aside the court's order terminating services. Even after her relocation to San Diego, Mother continued to miss many of Child's appointments. Further, the maternal grandmother's availability to provide transportation and other support was not a change in circumstance; Mother relied on transportation and other support from the maternal grandmother throughout the case.

Finally, there is little information on Mother's relationship with Father in the record. We agree with the court that there is insufficient evidence to show how the termination of this relationship is a significant change that would justify a modification of the court's order.

In sum, the court reasonably determined that no change in circumstances or new evidence existed regarding Mother's mental health as it related to Child's complex needs such that the order terminating reunification services and setting a section 366.26 hearing should be modified.

2. *Child's Best Interests*

Mother contends the reinstatement of family maintenance services and eventual return of Child to Mother's custody was in Child's best interest because: Mother addressed her mental health issues, she showed she could

meet Child's medical needs, there was a strong interest in preserving the family, and Mother maintained a relationship with Child. We conclude, even if there was a significant change in circumstances or significant new evidence, the court did not abuse its discretion by determining the Child's best interest was to remain with Caregivers.

In analyzing a child's best interest under section 388, the court should consider several factors: "(1) The seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*), italics omitted.) Also "vital" is "the length of time a child has been in the dependency system in relationship to the parental bond." (*Id.* at p. 531.)

Here, these factors strongly support the court's determination that remaining with Caregivers was in Child's best interest. Child had been placed with Caregivers for over four years since she was three months old. (See *Stephanie M., supra*, 7 Cal.4th at p. 317 [" 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' "].) Child had a strong bond with Caregivers and their other children. Although Mother had a relationship with Child from her visits, it was akin to a friendly, visitor type relationship.

We examine "the seriousness of the reason for the dependency in the first place . . . from the point of view of a child's interests." (*Kimberly F., supra*, 56 Cal.App.4th at p. 530.) In this case, the problem leading to

21

dependency was extremely serious from the Child's perspective. This Child requires dedication to understanding complex medical needs and to consistently appear at every appointment and perform daily tasks. The consequences of any failure to meet Child's needs could be dire. Although Mother undoubtedly loves Child, she has not shown she can do so. Before the case began, Mother missed Child's appointments and threatened to take her from the hospital without receiving lifesaving treatments. During the case, Mother left therapy after only a few months, did not pursue a medication evaluation from a provider who prescribed medications outside of active crises, lost contact with the Agency for months at a time, and failed to attend many of Child's appointments over the course of the four-year case, up to the time of the section 388 hearing.

On the other hand, Caregivers demonstrably understood and met Child's complex medical, developmental, and educational needs throughout the case.

Under the circumstances, the judge reasonably determined it would not be in the best interest of Child to modify the order terminating reunification services and setting a section 366.26 hearing. The court did not abuse its discretion in denying the section 388 petition.

B. *ICWA*

Mother contends the Agency and the court failed to comply with the initial inquiry required by ICWA and section 224.2. The Agency concedes that a limited remand is appropriate to ensure ICWA compliance, and we agree.

Congress enacted ICWA to address rising concern that Indian children were being separated from their tribes through adoption or foster care and placed with non-Indian families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.)

California subsequently enacted its own statutes specifying the steps the Agency and juvenile courts are required to take to determine whether a child is an Indian child before making placement decisions. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).) Under these statutes, the juvenile court and the Agency have an "affirmative and continuing duty to inquire" during dependency proceedings whether a child "is or may be an Indian child." (§ 224.2, subd. (a).)

"This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.) In the first phase, the Agency's initial duty requires it to, at a minimum, inquire from the party reporting child abuse or neglect whether they have information that suggests "the child may be an Indian child." (§ 224.2, subd. (a).) In the second phase, "if that initial inquiry creates a 'reason to believe' the child is an Indian child, then the Agency 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' " (*D.S., supra*, 46 Cal.App.5th at p. 1052, italics omitted.) In the third stage, "if that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*Ibid.*, italics omitted.) The failure to engage in a sufficient inquiry requires conditional reversal. (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125.)

Mother explains that the maternal grandmother identified her nephew, Bernard G., as having Indian ancestry and continuing to identify as a member of the tribe. The maternal great aunt confirmed that identification. But the Agency failed to obtain Bernard G.'s contact information to inquire with him. The Agency additionally failed to provide the maternal

grandmother's and maternal aunt's dates of birth in its inquiry letters to different tribes.

The Agency concedes that it erred by failing to inquire with Bernard G. and by failing to include the maternal grandmother's and maternal aunt's dates of birth on the inquiry to tribes.  We accept that concession and agree that a limited remand is appropriate for the Agency to comply with ICWA and section 224.2.

## DISPOSITION

The juvenile court's April 30, 2024, order denying the section 388 petition is conditionally reversed and the matter is remanded to the juvenile court with directions that the Agency comply with the inquiry provisions of ICWA and section 224.2.  If, after completing ICWA inquiry, neither the Agency nor the juvenile court has reason to know Child is an Indian child, the order entered at the April 30, 2024, hearing shall be immediately reinstated.  If the Agency or juvenile court has reason to know Child is an Indian child, the court shall proceed accordingly.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

KELETY, J.

24